## Case No. 1,880.

### The BRIGHT STAR.

[1 Woolw. 266;[1] 1 Am. Law T. Rep. U. S. Cts. 107; 8 Int. Rev. Rec. 130.]

Circuit Court, D. Missouri. Oct. Term, 1868.[2]

SHIPPING—PUBLIC REGULATIONS — INSPECTION OF VESSELS—FERRY-BOATS — DOMESTIC COMMERCE WITHIN STATES—ACT OF JULY 25, 1866 (14 STAT. 227, § 9), CONSTRUED.

1. A steamboat, licensed by state authorities as a ferry-boat, to run across the Missouri river, between towns on each of its banks, both within one state, but frequently employed in voyages beyond her ferry limits to distant towns, is not exclusively engaged in ferrying.

[See The Thomas Swan, Case No. 13,931; U. S. v. The Seneca, Id. 16,251. See, also. The Sunswick, Id. 13,624; The Montello, 11 Wall. (78 U. S.) 411.]

2. The simple allegation that such boat is a ferry-boat does not show that it is not subject to inspection under the act of August 30, 1852 (10 U. S. Stat. 61).

3. The act of June 8, 1864 (13 Stat. 120), subjects to inspection under that act ferry-boats engaged in foreign and inter-state commerce.

4. This act does not extend the requirement of the act of 1852 concerning the inspection of hulls, &c., to vessels engaged in commerce wholly within a state.

5. There is a commerce strictly internal to each state, over which congress has no control, although it may be carried on by means of the navigable rivers of the United States; and congress has, in its legislation, steadily kept this in view.

6. A steamboat was engaged in carrying passengers from one small town to others on a navigable river, all within one state. At times she carried between the same towns merchandise that was purchased in other and distant states, and, by usual and great routes of travel, brought to one place, whence it was shipped to the place where she received it. Held, she was not engaged in inter-state commerce, and her character would not have been changed had the merchandise which she carried been shipped from the place of purchase to the place of final destination in one continuous voyage.

7. The last clause of this section refers only to sea-going vessels, and requires them, when under way, except on the high seas, to be under the control of pilots licensed by the inspector of steam vessels.

8. The second clause subjects all vessels propelled by steam, while navigating any of the waters of the United States, to the rule for vessels passing each other established under the 29th section of the act of 1852.

9. Whether this is intended to include vessels not engaged in foreign or inter-state commerce, quaere?

10. Whether, in order to protect sea-going vessels, congress may impose upon vessels not engaged in foreign or inter-state commerce, rules necessary for the purpose, quaere?

11. Whether this clause had that end in view, quaere?

12. The first clause applies to all vessels, whether propelled by sails or steam, and was intended to furnish a rule for determining whether they are to be treated as foreign or domestic. That rule is, that vessels subject to the jurisdiction of a foreign power, engaged in

---

[1] [Reported by James M. Woolworth, Esq., and here reprinted by permission.]

[2] [Affirming decree of the district court in U. S. v. The Bright Star, Case No. 14,648.]

foreign trade. and not owned in whole or in part by a citizen of the United States, are not subject to our navigation laws. But all other vessels, however propelled, navigating our waters, are subject to those laws. Whether the clause means more than this, quaere?

13. This act does not extend the requirement of the act of 1852, concerning the inspection of hulls, &c., to vessels engaged in commerce wholly within a state.

[See U. S. v. The Echo, Case No. 15,021. Contra, The Ottawa, Id. 15,976.]

[Appeal from a decree of the district court of the United States for the district of Missouri.]

This was an appeal from a decree in admiralty. It was a libel of information, praying process of arrest against the steamer "Bright Star," and a decree for certain penalties, amounting in all to the sum of $20,-500, and that she be condemned and sold to pay the same. The libel in its first article set forth the 2d section of the act of July 7, 1838 [5 Stat. 304], "to provide for the better security of the lives of passengers on board vessels propelled in whole or in part by steam," which required such vessels to be properly licensed under existing laws, and that inspection of the hulls and boilers of the same should be made at least once in every year.

The second article is as follows: "Second, that between the 1st day of August, A. D. 1867, and the 31st day of August, A. D. 1867, the masters and owners of said steamboat being then and there engaged in making a certain voyage on the Missouri river, from the port or town of Washington, in Franklin county, in said eastern district of Missouri, on the south side of said river, to another port or place on the north side of said river, and being then and there a vessel propelled by steam, did transport goods, wares, and merchandise, and passengers on board said steamboat on said Missouri river, the same being navigable waters of the United States, without having first obtained from the proper officer a license under said act of congress in the first article of this libel designated, as in that behalf required, contrary to the form of the statutes of the United States, in such case made and provided, whereby, and by means whereof, the owners of said steamboat 'Bright Star' have forfeited to the United States the sum of $500, one half for the use of the informer, and for which sum the said steamboat is liable to be seized, and to be proceeded against summarily by way of libel in this court." Then follow sixteen articles, each, like the above, alleging voyages between different towns on the Missouri river, and all in the eastern district of Missouri. These towns were in Franklin, St. Charles, and Warren counties. The former is on the south of the river, and opposite to the others, which adjoin each other on the north of the river. It was in these different articles alleged that the steamer was not licensed, and had not submitted to inspection, as required by the act.

The answer of the claimants alleged: "That they admit that the said steamer 'Bright Star' has been used and navigated by them on the Missouri river, at and within the eastern district of Missouri, from the port or town of Washington in the county of Franklin, on the south side of said river, to another port or place on the north side of said river, and that she transported goods, wares, and merchandise, and passengers upon said Missouri river, without having a license therefor, at the several times alleged in the said articulations of said libel; but they deny that said steamer was required to have a license in that behalf, under the provisions of the act of congress referred to by libellant. * * * That the said steamboat 'Bright Star' was built as a ferry-boat, and was duly enrolled as such at the proper port; that since she was so built, she has been used as a ferry-boat, plying between the town of Washington aforesaid, on the Missouri river, and the opposite shore of said stream. * * * That at the said times set forth in the said libel, the said steamer was used and navigated on the Missouri river from the port of Washington, in Franklin county, on the south side of said river, then and there having, carrying, and transporting goods, wares, and merchandise on board of said boat upon said river; that the said steamer was used and navigated on said river as a ferry-boat, and in no other capacity; and that in transporting goods, wares, and merchandise, and passengers as aforesaid, she was purely transporting the same as a ferry-boat across said stream, from the port of Washington aforesaid, to a port or place on the opposite side of said stream. * * * That they have a license from the State of Missouri for said boat to navigate said waters as a 'ferry-boat,' and such being the case, a license from the government of the United States is not required and necessary. * * * That under the act of congress mentioned in said libel on the part of the United States, the said steamboat is not subject to inspection as claimed in the said libel, she having been built as a ferry-boat, and used only as such, and navigating only the waters of the Missouri river, purely within the state of Missouri. * * * And that they deny that by reason of the premises, as by virtue of the provisions of said act of congress, the owners of said steamboat forfeited or became liable to pay the sum of $500, as alleged by said libellant."

The libel was dismissed upon the hearing [U. S. v. The Bright Star, Case No. 14,-648], and the United States appealed to this court. [Decree of district court affirmed.]

Mr. Noble, Dist. Atty., for the United States.
Mr. Russell, for claimants.

MILLER, Circuit Justice. This is an appeal from a decree of the district court for

the eastern district, dismissing the libel of the United States against the steamboat "Bright Star." The "Bright Star" is licensed by the proper authorities of the state of Missouri, to run as a ferry-boat in the interior of the state, between the town of Washington, on the Missouri river, and the opposite bank of that river. She is charged, in various counts of this information, with carrying passengers and merchandise to towns on the opposite side of the river, both above and below Washington; and this fact is admitted by stipulation filed in the case. This suit is instituted upon the theory that she is subject to the various acts of congress requiring vessels, impelled in whole or in part by steam, to undergo periodical inspection, and to obtain a coasting license, with which provisions it is admitted that she had not complied.

The defences set up are: First, that the vessel is a ferry-boat, and for that reason is not included within the scope of these laws; second, that the acts of congress do not apply to vessels engaged exclusively in the internal commerce of the state; and third, that if they were intended to apply to this class of vessels, the acts are to that extent unconstitutional.

The first ground of defence cannot be sustained for two reasons: First. The boat was used, in the cases mentioned in the libel, outside her ferry limits, making many voyages between towns so distant as to forbid the idea that she was exclusively engaged in ferrying. Second. While it is true that by section 42 of the act of August 30, 1852, ferry-boats are excluded from its provisions, the 4th section of the act of June 8, 1864, declares that the provisions of the act of 1852, which require the inspection of hulls and boilers, shall apply to all ferry-boats which may be engaged in commerce with foreign nations, or among the several states. It is not, therefore, a sufficient defence in this case to say, that the vessel is a ferry-boat, and no more.

In order to determine what was the intention of congress in requiring this class of vessels to submit their hulls and boilers to inspection, it is not necessary to go further back than the act of June 8, 1864. The provision contained in the section already cited, including, as it does, ferry-boats, tugs, tow-boats, and canal boats, propelled by steam, was evidently intended to cover all vessels of those classes to which the constitutional powers of congress extended; namely, all such as are engaged in commerce with foreign nations or among the states. The omission to mention commerce with the Indian tribes may be attributed to the fact that there is no such commerce carried on by steam vessels. But there is commerce within the several states wholly internal to each, largely carried on by steamboats, and vessels exclusively engaged therein are carefully guarded from the operation of the act by its

very terms. Gilman v. Philadelphia, 3 Wall. [70 U. S.] 713. It is claimed, however, that this qualification of the act of June, 1864, is removed by the subsequent act of July 25, 1866. The two sections of the act last mentioned which are relied on to sustain this view are the 7th and 9th. The first of these enacts, that steamers used as freight boats shall be subject to the same inspection and requirements as, by the act of 1864, are provided for ferry, tug, and canal boats. From this language we can draw no inference that it was intended to include freight boats not engaged in commerce with foreign nations or among the different states. The intention was merely to extend to other boats the provisions which had, by the act of 1852, been limited to passenger boats.

Section 9 reads as follows: "That all vessels navigating the bays, inlets, rivers, harbors, and other waters of the United States, except vessels subject to the jurisdiction of a foreign power, and engaged in foreign trade, and not owned in whole or in part by a citizen of the United States, shall be subject to the navigation laws of the United States; and all vessels propelled in whole or in part by steam, and navigating as aforesaid, shall also be subject to all rules and regulations consistent therewith, established for the government of steam vessels in passing, as provided in the 29th section of an act relating to steam vessels, approved the 30th day of August, 1852. And every sea-going steam vessel now subject or hereby made subject to the navigation laws of the United States, and to the rules and regulations aforesaid, shall, when under way, except upon the high seas, be under the control and direction of pilots licensed by the inspectors of steam vessels: vessels of other countries and public vessels of the United States only excepted."

There are in this section three distinct purposes declared by congress in regard to three distinct subjects. Taking them inversely, the last clause refers alone to sea-going vessels, and enacts that when under weigh, except on the high seas, they must be "under the control of pilots licensed by the inspector of steam vessels." The object of this was, no doubt, to meet the decision of the supreme court of the United States, which had ruled in Pacific Mail Steamship Co. v. Joliffe, 2 Wall. [69 U. S.] 450, that pilots in the harbor of San Francisco had a right to navigate sea-going vessels, although not licensed by the inspector of steam vessels; and to make it plain that all harbor pilots must be so licensed.

The next clause subjects all vessels propelled by steam, while navigating any of the waters of the United States, to the rules of vessels passing each other established under the 29th section of the act of 1852. Whether this clause was intended to include vessels not engaged in commerce with foreign nations or among the different states,

It is not necessary to inquire, as there is no charge in the libel of any violation of these rules. It is ably contended by the district attorney, that congress has the right, in order to protect sea-going vessels, to impose upon vessels not engaged in commerce with foreign nations or between different states, such rules as may be necessary for the safety and security of such vessels, and of the persons and property thereon; and that the provision here mentioned was designed to apply to all vessels passing each other in the navigable waters of the United States. We are not prepared to say that this is not a sound view of the provision; nor do we decide that it is. It does not immediately concern the case.

The other provision of this section applies to all vessels navigating the waters of the United States, whether they are propelled by sails or steam; and is intended to furnish a rule, by which it may be known whether they are to be treated as foreign vessels or as American vessels. That rule is, that vessels, subject to the jurisdiction of a foreign power, and engaged in a foreign trade, and not owned in whole or in part by citizens of the United States, are not American vessels, and are not subject to our navigation laws; and that all other vessels, however propelled, found navigating our waters, are to be subject to those laws. Does the clause mean anything more than this? What is meant by our navigation laws? If it means all the laws enacted for the protection of the lives of passengers, why were the two subsequent clauses used? For they apply only two of the provisions of the act of 1852 to two classes of vessels navigating the waters of the United States, when the first clause says that all American vessels shall be subject to the navigation laws of the United States.

These and other questions may not be very easily answered, and are not necessary to be answered in this case. It is sufficient to say that we do not think this clause, or any other clause in this act, was intended to extend the requirements of the act of 1852, concerning the inspection of hulls and boilers, to vessels engaged in commerce wholly within the state.

The policy disclosed so clearly by the act of 1864, to confine this class of legislation by congress to vessels engaged in a commerce within the power of congress to regulate, can hardly be supposed to be reversed by the language of this section when the main purposes intended to be secured do not require it. We are also thoroughly impressed with the conviction that there is a commerce strictly internal to each state, over which congress has no control, though it may be carried on by means of the navigable rivers of the United States; and that congress has, in its legislation, steadily kept this in view.

Speaking of the terms of the commercial clause in Gibbons v. Ogden, 9 Wheat. [22 U. S.] 1, Chief Justice Marshall says: "It is not intended to say that these words comprehend that commerce which is completely internal, which is carried on between man and man in a state, or between different parts of the same state, and which does not extend to or affect other states. Such a power would be inconvenient, and is certainly unnecessary. Comprehensive as the word 'among' is, it may very properly be restricted to that commerce which concerns more states than one. The phrase is not one which would probably have been selected to indicate the completely interior traffic of a state, because it is not an apt phrase for that purpose; and the enumeration of the particular classes of commerce to which the power was to be extended would not have been made had the intention been to extend the power to every description.

It has been strongly urged that the admiralty jurisdiction in the federal courts extends to all the navigable waters of the United States, though the voyage may be limited to the ports of the same state; and that a corresponding rule should be applied to the power of congress over the commerce so carried on. But if we concede that the proposition is true as to admiralty jurisdiction, a concession [which must be] [3] made in the face of many decided cases, the inference claimed by no means follows. By the federal constitution, admiralty jurisdiction is granted to the courts of the United States; the power to regulate commerce is granted to congress. The grant of admiralty power is limited expressly to certain kinds of commerce. On this subject, we agree entirely with Chief Justice Chase, in his opinion in the case of The Mary Washington in the Maryland circuit [Case No. 9,229].

Since the appeal was taken in this case, a statement of agreed facts has been filed as further testimony, by which the prosecution claims that it is admitted that the "Bright Star" was engaged in commerce between the states. The substance of this statement is, that besides carrying passengers from Washington to Pinkney and to Augusta, she also, at the several times mentioned, carried merchandise of various kinds, which had been purchased in New Orleans and other cities not in the state of Missouri, and had been transported by the usual routes of commerce to St. Louis, thence to Washington, and by the "Bright Star" from Washington to Pinkney and Augusta. It is not stated whether this was done as one continuous voyage or not. It is consistent with the stipulation, that the goods terminated one voyage at St. Louis, and were purchased there by some one residing at Pinkney or Augusta, to whom they were forwarded from that city. It is however expressly stated that the "Bright Star" was not running in

---

[3] [From 8 Int. Rev. Rec. 130.]

connection with any line of steamboats or railroad cars. We do not think these facts prove the boat to have been engaged in commerce among the states. Nor would we change our views if it were conceded that the merchandise came from New Orleans to Pinkney or Augusta in one continuous voyage. The only relation which the boat has, under such circumstances, to any commerce, is transportation. Her part in this transportation is too limited, casual, and uncertain, to call it an engagement in commerce among the states. The owner of this small vessel had a right to transport a few boxes of goods from one little town to another, as occasionally became necessary, without inquiring whether the goods came from beyond St. Louis, or how they came to Washington. It constituted no part of any line of interstate communication. It ran in connection with no such line of travel or transportation. To hold under such circumstances, that it was engaged in commerce between the states, is to include all transportation of goods within that commerce.

The decree of the district court must be affirmed.